Sam Strait on behalf of Appellant 3form, may it please the Court, there are two fundamental reasons to reverse the trial court's summary judgment on inherency. First, there is unrebutted expert testimony that at least one panel, that's Deposition Exhibit 421, produced by Lumicor's expert following the Schober process, did not have a substantially natural-appearing confirmation. Under Novifarm, the case should be reversed right there because they do not have clear and convincing evidence that following Schober every time produces panels with naturally-appearing confirmations. And Dr. Gautreaux, 3form's expert, in his deposition described the reasons why, and that's at the appendix, pages 743 to 45, also quoted in our reply brief. He explained in detail that there was splitting and cracking in the compressible objects that as soon as you have that expert testimony, that creates a genuine issue of material fact that the Court resolved against 3form on summary judgment on a clear and convincing evidence standard. And based on that alone, the case should be sent back. In addition, Dr. Flynn, who was— Strait, do we have that particular rendition, if you will, in the record? Where is that? Is there a picture of that? I don't think the picture is in there. The testimony is at 743 to 45, but the picture itself of Deposition Exhibit 421, I don't believe, is in the appendix. In addition, Dr. Flynn, who was Lumicore's expert, did a test, too, and on the Madagascar decor, again, a compressible object, under that test, too, it had so many cracks and splits at the cross points that he reported over 80% of them were damaged. They cannot demonstrate that the Schober 327 process will result every time in a substantially naturally-appearing panel under those facts. And all of the arguments that come back to the contrary are classic fact disputes that the district court should not have resolved on a summary judgment, clear and convincing evidence standard against 3-4. In addition, and this is on the 700 Inherency, Lumicore has no evidence to invalidate Claims 5 and 16, which concern polycarbonate. Why? Because Lumicore did no testing using polycarbonate. How can you establish clear and convincing evidence that a test panel with polycarbonate will result in a substantially naturally-appearing confirmation every time when you did no testing? There's a reason that this court in Trintec said that Inherency cases are quite rare. And I would submit Inherency cases on summary judgment are even rarer because of that identity requirement that's required, and Lumicore, in this case, has failed to satisfy and meet that burden. Now, with respect to obviousness, the district court also found that the 700 patent, the remaining claims that call out PETG as the resin, that those were therefore obvious and granted summary judgment in that regard in validating those claims of the patent. That decision should also be reversed because, number one, the district court expressly relied on his anticipation finding to invalidate those PETG claims. But second, Three Forms expert witness, Dr. Gautreaux, testified that there was no motivation to combine the teachings of the 327 patent with PETG. Once you have that expert testimony, it creates a fact issue that the jury should have been allowed to define. Didn't your experts' tests, they were not admitted, right? The experts' tests, that is correct, Your Honor. And that's a very important distinction. Only his tests and a very small portion of his expert report related to tests. He gave pages and pages of other testimony that was not excluded that related to other And you're not relying on the tests rather than you're talking about a genuine issue of material effect. Now, where in the record did you, either through attorney argument or through your expert, in any way respond to the tests that were done by Lumicore's expert and question those? Okay. And, Your Honor, that specifically goes back to Exhibit 421 where Dr. Gautreaux presented in his expert deposition. Here's Exhibit 421. This is a panel that was produced following the Schober process. Take a look at this. Is this a substantially natural appearing confirmation or not? Dr. Gautreaux testified it is not, and he identified the reasons why. So counsel showed Dr. Gautreaux... Wasn't that done using Test 5, though? And Test 5 wasn't the Schober method? So how is that reliable? I think it's... First of all, there's no dispute, and we didn't challenge reliability of Dr. Flynn's... How is that relevant? Forget about my word. I should have said relevant. No. And, Your Honor, it's directly relevant for two reasons. Number one, it still follows the Schober process to this extent, 40 PSI for the first, bump the press, open the press, and then 120 PSI on the back end. Dr. Flynn, their expert, said that there's no material difference between using 120 as the second pressure and 160 with respect to the deformation. And, in fact, Your Honor, if you're using... But he was relying on Test 2, right? Wasn't he relying on Test 2? No, but with respect to Test 5. So Test 2 is the Madagascar where he testified about the cracks and crushes and splits. Test 5, he said in his expert report that there is no difference. It's indistinguishable. And that's in his expert report, Appendix at 834. He says if you use this lower pressure, 120, on the back end of this process, the result you're going to get in terms of the substantial natural appearance is going to be indistinguishable if you use 160. And, frankly, Your Honor, it helps prove our point because 160, you would assume, would have more deformation, less natural conformation. So the fact that he used 120 just proves the point that when they're using the Schober process, you're going to get at least one or two panels that do not have a substantially natural appearing conformation. And as soon as we have that, a summary judgment should not have been granted and it shouldn't have been sent back. Then, with respect to obviousness on PETG, as I said, there was no motivation to combine, our expert testified. And the sole purpose of Schober's two-step process, as described in the 327 patent, was to end up with a solitary, unitary panel that didn't have defects in the matrix of the panel so that the plastic didn't have bubbles or cracks or things like that. There is no mention whatsoever in the Schober patent about an effort to maintain a natural conformation of any of the products that are inside and embedded within the plastic. So on appeal, LumaCore argues that, well, if you look at the difference between our provisional and our utility application, we added the second pressure step in our utility application, therefore it must have been to go and address this issue of compressible objects. But the record simply doesn't support that for one reason. The provisional application and the utility application both include the only item that LumaCore is arguing is compressible, namely twigs. So if twigs are in the provisional application and you're only using one pressure, twigs are also in the utility application and you're using two pressures, the second pressure can't have anything to do with preserving a substantially natural conformation. And when you look at the language of the patent, there's not one word in that patent that says what we're trying to do here is make sure twigs or anything else maintains a natural conformation. And finally, with respect to PETG, the district court didn't rely on tests that were done by Mr. Schober, the owner of LumaCore, so there's no record for this court to review on PETG. Combine that with the lack of a motivation to combine that our expert testified to and summary judgment must be reversed. Finally, with respect to the 068 design patent, the district court also made fundamental errors on summary judgment, again, clear and convincing standard, because Freeform's expert testified that her conclusion that one of ordinary skill in the art would not replace the reads that are in the design patent of the 068 with the grasses that are illustrated in the 327 patent. And it wasn't a conclusory opinion, she gave detail that there's a distinct visual impression between reads that you see in the 068 and grass that you see in Schober. And what she specifically said is grass panels don't have nodes like read panels do. The 068 patent's density is greater, and she directly responded in her expert rebuttal report to Mr. Schober's testimony that all one of skill in the art would have to do is look at his patent and substitute in grass for read. And she specifically said that argument does not hold up. Now, a jury might see this one way or the other, but the critical point here is this kind of record is not appropriate to grant summary judgment on clear and convincing evidence standards. Straight. One question. In your brief, you have a section devoted to claim construction, but you haven't argued it here. And that's neither here nor there. Do you feel we can decide this case without getting into the claim construction issue? I think you could, Your Honor. We do think there was error in the claim construction, and I believe the errors in the claim construction help inform why some of this critical evidence that we've outlined in the briefs and here today was overlooked by the district court. When he mistakenly construed, and I don't think LumaCorp really- Why do you think we can decide the case without getting into the claim construction issue? Because regardless of how you look at substantially natural appearing confirmation, our experts said that there's a panel out there that was created consistent with Schober that doesn't have a substantially natural appearing confirmation regardless of what the claim construction ends up being. We think that the district court was incorrect in the claim construction. LumaCorp doesn't argue to the contrary. LumaCorp just says, well, it's irrelevant because it doesn't matter to the rest of the decision. We think it does help provide and inform why the district court overlooked this testimony about unnatural confirmations and this testimony from Dr. Flynn's tests because the district court wasn't thinking about or had excluded in his mind cracks and splits in the natural decors as substantially natural or unnatural. In addition to the summary judgment factual issue decided against three form on summary judgment, the district court also made legal errors with respect to the way it analyzed the 068 design patent. Specifically, the district court chose a primary reference that was never identified by the parties as such. LumaCorp identified and the parties briefed Schober as the primary reference. And when you look at the district court's opinion, under the district court's analysis, a patentee like three form in this case would have to analyze every item that was even mentioned in briefing. Wasn't it listed as a possible primary reference in the record at page A517? I read that and I think it's referring to this as a possible reference. It even has a picture of it as being one of the possible primary references. But it doesn't say possible primary reference. What it says is these designs are all basically the same. But what LumaCorp briefed was the primary reference is Schober. And so the parties briefed, here's the primary reference at Schober. It was a surprise to all of us, I believe, that the district court instead chose exhibit five to be the primary reference when the parties had briefed something else as the primary reference. And finally, as we've argued in the briefs, the district court made this fatal mistake of taking a design concept and saying it's not difficult for the court to imagine a reference that would have the same overall appearance. I'm going to just go back to this for a minute because at page A517, it says, as explained above, a designer would have been motivated to modify any of the above panels to replace the existing stocks and so on. And when it's talking about any of the above, there's four of them and one of them is exhibit five. So what am I missing? Again, I think- I mean, I read that in patent law as meaning that would be the primary reference, even though the magical words primary reference aren't used. But what LumaCorp asserted was the primary reference was the Schober patent. But again, even if that's true, that it could have been any one of the five, the problem with it is for exhibit five, they don't have corroboration. And had this been pointed out, hey, this is going to be the primary reference, we would have spent a lot more time arguing the issue of corroboration on exhibit five of whether it's even prior art. All you have is the testimony of the founder of LumaCorp saying, I think we sold these prior to this time. I see I'm into my rebuttal time, if I could reserve it. Thank you. May it please the court, Your Honor, Larry Graham on behalf of LumaCorp. With regard to the 700 patent, the utility patent, the principal argument here is that there is one panel in which there was not a substantially natural confirmation. Mind you, of course, that's one panel out of hundreds or perhaps thousands of panels that were accused of infringement or made by either our expert, Dr. Flynn, or by either of the two experts on behalf of three more, three from Dr. Strong or Dr. Gatraux. And of those, there was one that Dr. Gatraux said might not have a substantially natural confirmation. I would submit that the overwhelming wave of the evidence would allow this court to the prior art process of the 327 patent still produces the natural confirmation every time, even notwithstanding that panel. But if you look at it closer, as the court pointed out, that one panel was not made strictly in accordance with the 327. And starting at appendix 743, you see the testimony of Dr. Gatraux further indicates that it's not even that clear whether it's a compressible object or not. Dr. Gatraux says, well, at 744 in the middle of line 13, he's not sure if the thing that's in there that was split or cracked was either reed or grass. Three form devotes a lot of attention to the fact that grass, as illustrated in the prior art 327 patent, is not a compressible object. And here Dr. Gatraux says, well, the thing that I see that's split in that one exhibit 421, it may or may not be reed or grass. I can't really tell. Then he says the same thing at 745. Right, but I can't tell whether it's a reed or not, so I'm just referring to it as a reed. He notes that it was green, and I would submit that it was actually grass because it had a mix of reeds and grass in it. Note further, of course, that this question of whether it had a substantially natural confirmation or not is something that Dr. Gatraux says is a function of whether it's commercially marketable. In their infringement contentions, the accused products, as Mr. Schober testified, had all manner of flattening, cracks, and splits in them when they're marketed. Not one of those was ever excluded in the infringement contentions as being not substantially natural. This one is the only one. How do you know whether it's substantially natural or not? Well, whether it's marketable. That gets to the question of the indefiniteness of this question in the first place. Here we have Dr. Gatraux looking at a single panel and seeing a split in what is a blade of grass, which he doesn't know also by his testimony whether it was there before it was placed in the panel or whether it was caused to be split through the process itself and opining that this one is not substantially natural. There's no way to know. It's so inherently indefinite, so subjective, you just know it when you see it. What about the fact that Three Form's expert testified that Three Form does this kind of visual inspection? This is part of what they do as their business. So what if ordinary skill in the art would know when this limitation is met or not? The problem with that is the standard is going to be different for each person who applies it. Three Form may have a more exacting standard, or maybe LumaCore has a more exacting standard. Maybe one of them lets all manner of cracks and splits go out the door and don't care. The ones in the Madagascar test that Three Form alluded to about the number of cracks in Dr. Flynn's test, lots of cracks. Dr. Gatraux did not say that any one of those, despite those large number of cracks and splits where the reeds were crossed over, didn't say that any of those were not substantially natural. Do you think the district court reached the claim construction that it did because it was trying to put an exacting standard on what those words mean? It seemed like the district court was trying to do that, even though that standard is not the one that either side's expert used. So it creates yet an additional problem. So I would submit that given the overwhelming weight of the evidence, it's very clear that the 327 patent produces the product within the scope of the 700 claims as applied by their experts and Three Form every single time. We have a couple of other issues raised that I would like to address. My colleague says that there was no test on polycarbonate, and of course that's true. Dr. Flynn, though, testified that all of these other resins, PETG, polycarbonate, and so on, they all behave the same way. The only thing that's different is that you use a different temperature when you apply the process. That's it. Is there any contradictory testimony to that? Contradictory testimony? Yes. Any evidence on the record that would undermine that expert's testimony? Nothing that I believe is admitted. The only contradictory testimony I'm aware of is that of Dr. Gatra, which I believe was excluded under Rule 702. Dr. Gatra only says that a person of ordinary skill in the art wouldn't appreciate the importance of temperature. And he was effectively saying that you would use PETG, but you would use a temperature that's much too high, because you don't know what temperature to use. And he did that in his failed test. That test was excluded because, of course, the temperature he used was too high, and the time that he applied the high pressure was clearly too long, although we don't know because he didn't keep the records. And his other testimony that you're saying might undermine the question on the polycarbonate, that that testimony was excluded as well? I believe that the testimony was excluded because the testimony was entirely based on that false premise test. And if you exclude the test, you have to exclude the testimony as well. Even so, there's nothing about the testimony that makes any sense. It doesn't counter the clear and convincing testimony otherwise. Even the inventor. Yeah, but we're looking at summary judgment, and we have to see whether there's a genuine issue of material fact. Fair enough, Your Honor. And on that point, then I would clearly submit that the testimony that has to be excluded along with the test that was excluded. Otherwise, there's no test to base the testimony on. And that gets to the issue of the motivation to combine with PETG. Dr. Fling clearly says there's a motivation. All residents, they're the same. He relies on the prior art that has the PETG panels and says they all behave the same. There's the motivation. And the only counter to that is the excluded testimony of Dr. Gattro. We have the argument advanced by my colleague with respect to twigs and the argument in the provisional versus that in the utility. And I would submit that that's one of the topics that was not raised below and should not be admitted in this appeal as well. The notion is that in the provisional application, Mr. Schober's 327 patent predecessor provisional had only one pressure and mentioned twigs. And then in the utility, he mentions two pressures. And therefore, the second pressure can't have anything to do with improving the natural confirmation of twigs. But of course, there's no reason for that not to be true. There's nothing in the record below for why that's not true because it wasn't raised. But it's quite simple that Mr. Schober recognized somewhere in between the timing of those two filings that using two steps improved the performance of the product. But it doesn't even matter. It doesn't even matter because all that does matter is if you apply the process of 327 patent with the two pressure steps, and if it produces the product in the substantially natural confirmation within the scope of the 700 claims, then it anticipates. Dr. Gattro also agreed repeatedly that the purpose of the two pressures in the 327 patent was to avoid the crushing. He said that twice in his deposition. Clearly, it has that effect whether it was stated as such expressly in the 327 patent or not. With respect to the 068 patent, we have a very simple substitution of grass for reeds. And this is one of those really odd design patents, not much like it. Every single product is different. Every single accused product is different. There never has ever been a product that looks exactly like the design patent is illustrated because these are natural materials placed by hand. And so all we have here is a replacement of something that's basically the same. At appendix page A1047, I believe, is where we have, actually starting earlier than that, in terms of the surprise and the use of reference number five, in three forms briefing below, we have three forms opposition to our motion for summary judgment and their articulation of the statement of facts. At A1042, starting there, at fact number 80, we said the 327 patent describes an architectural panel of basically the same design as the 068 patent. That basically the same design, that's the magic word. That means primary reference. That's what you have to prove to establish a primary reference. Clearly, that's what it's getting at. So that gets to the image of the prior R327 patent. The next paragraph, number 81 in the middle of appendix 1043 says, prior to the critical date, Lumocore was making offerings, disclosing, selling a variety of panels having generally parallel long stock grasses, each of which is basically the same design as the 068 patent. Again, magic words. We're saying these are also primary references. And then it cites all of those grass panels, which includes exhibit number five. Then three form, in its own briefing, looks at every one of those and incorporates images at 1044 and 1045 of every one of those, labeling exhibit five at the bottom of page appendix 1045, clearly knowing and acknowledging that we're relying on exhibit number five as one of several possible primary references. And then it continues at 1047, paragraph 82, replacing the grass in the Lumocore products, the grass products, or in the illustration of the 327, either one would produce the claim design. So clearly in the record below, there should not have been any surprise. We were saying that you could choose any one of those as a primary reference, substitute wreaths for grass, and get the same design. There's an argument about corroboration for exhibit number five, and this was also not raised below. If it had, I think it should have carried the day anyway. Mr. Schober submitted a declaration with an image that had a date on it, with testimony saying that it was a product that had the image was taken for his website, and he had an email for an order of the product. That should have been sufficient corroboration anyway. I suspect that because of the strength of that evidence that was submitted below, 3FORM didn't challenge it. They didn't raise corroboration below and shouldn't be doing so now. Lastly, we have the motivation to combine here and whether it would produce the result. The most we have from 3FORM's expert, Ms. Lewis, is that a consumer who wants a reed product or a grass product wouldn't substitute one for the other. She's coming at it the wrong way. She doesn't talk about the motivation to combine references and whether if you saw the prior art with grass in it, it would be obvious to substitute the reeds instead and get the claimed design. She also never saw and did not consider the other prior art references that we rely on for that motivation. She was not given the Schober patent. She was only given the drawings. She said in her deposition that she didn't read that. She only looked at the drawings. She was also not given the press release that 3FORM admits is timely and predates the critical date that says, hey, here's a thatch product. She knows nothing about those prior art references that would provide a motivation to put reeds in there instead of the grass. She can offer no compelling opinion, nothing really that's worth anything about whether a designer would be motivated to combine the two and substitute the reeds for the grass. It's quite simple, of course. The 327 patent literally says as much. Here's the one that we drew with grass. By the way, put reeds where the grass is. The same thing with the press release. Either one of those would provide a motivation. Ms. Lewis can't testify about whether that does provide a motivation to combine because she never read it. She knows nothing about it. This is very, very dead simple stuff. She admitted that if you took at least one of the grass products and put a reed in every single place where there was grass, it would get you the same design. All you need from that point is why would you do that? There were two distinct prior art references that say why, the Schober patent and the three-form press release. At that point, it's clear and convincing, and there's nothing more that's necessary. Unless there are further questions, I'll yield my remaining time. With respect to Dr. Gautreaux, on this panel that we've spent quite a bit of time talking about, his testimony was unequivocal. This is in our appendix. It's at page 746. He specifically says there's a reed that's just to the left of the Exhibit 421 sticker. There's a reed that runs the length of a panel, and that, again, appears to have a split or deformation through the length of the panel. He wasn't confused. He knew that there were compressible objects in Exhibit 421, and he testified that they were not a substantially natural appearing confirmation. With respect to indefinite ... How do you respond to the point that there were thousands of panels that had it naturally conforming? Under this court's case law, that's irrelevant. If there's one that shows that it didn't prove it, and that's under NOVA Farm Glaxo, then that means it can't, every time that you follow their process, produce a substantially natural appearing confirmation. Under the strict identity requirements of inherency, that one is enough to say you don't get to invalidate on clear and convincing evidence on summary judgment. With respect to indefinite ... Didn't he, on page 745, A745, say that he wasn't sure if it was a reed? What he said was, he wasn't sure what all of them were, but then he goes down and says in that second page I just read, that there is a reed. He wasn't sure what all of the items were in that panel, but he says down below ... Oh, he said there were different things. Right. There were different ... And that's how these work sometimes. There are different kinds of decors. With respect to indefiniteness, this issue was never raised with the trial court. They didn't move for summary judgment on indefiniteness. If you look at the appendix, page 476, it's clear they moved on two issues, obviousness and inherency. Didn't move on indefiniteness, so this court shouldn't address that now. I see I'm out of time. Thank you. Thank you.